Ranney, J.,
delivered the opinion of the court:
Wo shall notice but one of the errors assigned, as, in the opinion of the court, that is decisive of the case, and upon a ground that precludes the possibility of remanding it for another trial. The plaintiff in error was charged with the offense of assault and batteiy, tried by a jui-y of six men under the act of March 14, 1853, “defining the jurisdiction and l'egulating the practice of probate courts; ” found guilty, and sentenced to pay a fine of one hundi'ed dollars and costs. He objected to the proceeding in various ways during its progress; and now insists that the act under which it was had, in so far as it authorizes a conviction upon the finding of such .a jury, is unconstitutional and void.
Two sections of the fii’st article of the constitution are relied upon.
Section 5 provides: “ The right of trial by jui’y shall be inviolate.”
*In section 10, it is provided: “In any trial, in any court,' *263 tbe party shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed; nor shall any person be compelled, in any criminal case, to be a witness against himself, or be twice put in jeopardy for the same offense.”
By the first of these sections, the right of jury trial is recognized to exist, and its continuance unimpeaehed is provided for. By the last this right is declared to belong to every person accused of any crime or offense, in any court of the state.
What, then, is this right ? It is nowhere defined or described in the constitution. It is spoken of as something already sufficiently understood, and referred to as a matter already familiar to the public mind. The same article furnishes other examples of the same generality of expression. By section 8: “ The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion, the public safety require it.” In what does the privilege of this great bulwark of personal libery consist? The constitution furnishes no answer, nor was it necessary that it should. If ages of uninterrupted use can give significance to language, the right of jury trial and the habeas corpus stand as representatives of ideas as certain and definite as" any other in the whole range of legal learning.
Tbe institution of the jury referred to in our constitution, and its benefits secured to every person accused of crime, is precisely the same in every substantial respect as that recognized in the great charter and its benefits secured to the freemen of England, and again and again acknowledged in fundamental compacts as the great safeguard of life, liberty, and property; the same, brought to this continent *by our forefathers, and j>crseveringly claimed as their birthright, in every contest with arbitrary power, and finally, an invasion of its privileges prominently assigned as one of the causes which was to justify them, in the eyes of mankind, in waging the contest which resulted in independence. Nor did their affection for it then diminish or cool. They made it a corner-stone in erecting the state governments; and after the adoption of the federal constitution, without a provision securing it? *264 they did not rest satisfied, until they had proposed and carried an amendment, giving to every person accused of crime in the courts of the Union, “ the right to a speedy and public trial, by an impartial jury of the-state and district wherein the crime shall have been committed.”
In the ordinance of July 13, 1787, which first extended civil government over the .territory northwest of the river Ohio, it was made an unaltei’able article of compact, that “ the inhabitants of the said territory shall always be entitled to the benefit of the writ of habeas corpus, and of the trial by jury.” Upon the organizaT tion of the state government in 1802, provisions, substantially the same as those in the present constitution, were inserted in the bill of rights. It thus appears that persons accused of crime have, for every moment of time since civil government existed within the territory of this state, by fundamental laws, been secured in the i'ight of trial by jury. An institution that has so long stood the trying tests of time and experience, that has so long been guarded with scrupulous care, and commanded the admiration'of so many of the wise and good, justly demands our jealous scrutiny when innovations are attempted to be made upon it.
It remains to consider what were the distinguishing features of this mode of trial as it existed at common law, and as it has always been known and used in this country. I do not propose to attempt to discover its origin, or to determine at what time, or by whom, it was first introduced into England. Able men, with all the information to bo had, have differed upon it. The distinguished commentator upon the laws of England informs us that traces of it are to be found *in the'laws of all those nations which adopted the feudal system, “ who had all of them a tribunal composed of twelve good men and true;” and that “the truth-seems to bo, that this tribunal was universally established among the northern nations, and so interwoven in their very constitution, that the earliest accounts of the one give us also some traces of the other.” After delineating with admirable clearness the means the law has provided to secure the independence, purity, and impartiality of the jury, and painting in glowing colors the many advantages of this mode of trial, this author proceeds to say : “Upon these accounts, the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And if it has so great an advantage over others in regulating civil property, how *265 -much must that advantage be heightened when it is applied to •criminal cases. But this we must refer to the ensuing book of these commentaries; only observing, for the present, that it is the most transcendent privilege which any subject can enjoy, or wish for, that he can not be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals. A constitution that, I may venture to affirm, has, under Providence, secured the just liberties of this nation for a long succession of ages.”
Pursuing the same subject in the fourth book of his commentaries, in its application to criminal prosecutions, he characterizes it as the bulwark of the liberties of Englishmen; and affirms that the •truth of every accusation, whether preferred in the shape of indictment, information, or appeal, must be confirmed by the unanimous suffrage of twelve of his equals and neighbors, and superior to all suspicion,” before the accused can be subjected to any manner of punishment.
We have extracted somewhat at length from this eminent author, for the purpose of showing beyond controversy the number of the jury at common law, as well as the other essential elements •of its constitution and action. The number must'be twelve, they must be impartially selected, and must unanimously concur in the guilt of the accused before a conviction can be had.
*We might cite other writers to the same purpose, but it can not be necessary.
We are of opinion it was this very tribunal, thus constituted, that those who framed and adopted the constitution of this state intended to perpetuate and make the safeguard of innocence, by securing its benefits to every person accused of crime in any of its courts.
There is certainly nothing in our history which points to a different conclusion. For half a century before its adoption, similar provisions had been so considered and acted upon. Until the passage of this law, no person had ever been convicted of crime by less than the concurrent assent of twelve of his peers; and no law has ever attempted to authorize it to be done.
If- the power exists to diminish the number of the jury, it may be applied to all cases, and it may be reduced to two as well as to six. The same constitutional provision that secures the right in a charge involving the life of the. accused secures it also in every *266 other criminal case. It is no answer to say that this would not-likely be done. If it had been deemed safe to leave it to the discretion of the general assembly, no constitutional provision was needed; but, whether needed or not, it has been ordained by a power which both the general assembly and this court are bound to obey.
A moment’s consideration will show that diminishing the number impairs the right, lessens the security of the accused, and increases the danger of conviction.
If corruption or prejudice are to be feared and avoided, they are-much more likely to influence the conduct of six men than of twelve; and if the jury are honest, impartial, and pure, it is a self-evident fact that the chances of a conviction upon conflicting evidence, by the unanimous approval of the larger number, is many times less than by the smaller. Nor is a conviction, even in cases to which this act extends, a matter to be lightly considered. The reputation and hopes of a man, and all those who stand connected with him, *may be as effectually blasted by an unjust verdict of guilty upon a charge of petit larceny as for many crimes of much higher grade.
But, without pursuing these considerations further, our ojúnionis that the essential and distinguishing features of the trial by jury, as known at common law, and generally, if not universally, adopted in this country, were intended to be preserved, and its-benefits secured to the accused in all criminal cases, by the constitutional provisions referred to; that it is beyond the power of the-general assembly to impair the right, or materially change its character ; that the number of jurors can not be diminished, or a verdict authorized short of a unanimous concurrence of all the jurors-It follows that the act under which this conviction was obtained, in so far as it provides for a jury of six only, and authorizes a conviction upon their finding, is unconstitutional and void.
In coming to this conclusion, we have not referred to the decisions in other states, because we were entirely willing to take the responsibility of considering the question upon principle alone. The question has seldom arisen, but whenever it has, the same result has followed, without a single dissenting opinion or dictum to the contrary, so far as we are advised.
We have deemed it our duty to meet and arrest, at the outset, what we can not but regard as an infringement of a great consti *267 tutional right—not in a very flagrant manner, but, nevertheless, opening the door to further encroachments. So far as the argument of convenience and expedition is concerned, we can not do-better than to reply, in the language of Justice Blackstone: “ However convenient these may appear at first (as doubtless all arbitrary powers, well executed, are the most convenient), yet let it be again remembered that delays and little inconveniences in the forms-of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fraudulently opposite to the ^spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous-concern.”
It would not be appropriate, nor do we intend to extend this opinion to determine the application of the right of trial by jury in civil cases. It is, however, well known that it never extended to all courts having civil jurisdiction, nor to the trial of all disputed facts.
Section 5 of article 13 has sometimes been referred to as containing, by implication, a warrant for supposing it was intended to authorize a jury of less than twelve, by the section of the constitution which we have been considering. This section relates to the compensation required upon appropriating the right of way to the use of a corporation, authorized to construct a public improvement, and provides that such “compensation shall be ascertained by a jury of twelve men, in a court of record, as shall be'prescribed by law.”
Why, it is asked, fix the number here, if the term “jury,” used in other sections, ex vi termini, implies that number? The reason is obvious, and the answer plain. It has been held in Willyard v. Hamilton, 7 Ohio, 115, pt. 2, that the value of property taken for public uses might rightfully be assessed by commissioners, it not being a case for trial by jury, secured by the constitution; and that the proceeding need not be had in a court of justice. And the reason why it was not secured by the constitution was, that it had never been so regarded in England or this country prior to the adoption of that instrument. This course of proceeding by commissioners, had been much complained of as unjust and oppressive to the owner of the property; and to make at once a proceeding within the protection of the constitution, and to be pursued in a. *268 •court of justice with a common-law jury, this section 5 of article 13 was inserted when the constitution was revised.
It intended to afford the party the same protection as in other -cases of jury trial—no more and no less ; and if any inference is to be drawn from specifying the number of the *jury, it is very strong evidence of the sense of the convention, that that was what had already been secured by the other sections, to suitors in other •cases.
We do not intend to imply a doubt of the constitutionality of the .act allowing juries before justices of the peace, composed of six men. Wherever facts are to be found in any proceeding, in which a jury was not required by the common law, a jury of any number may be authorized, within the discretion of the legislative body. •Juries did not belong to these inferior courts at the common law, and so long as an appeal is provided for the common-law courts from their determinations, it is clear no constitutional objection •can arise, whether facts are found by the magistrate or by the aid of a jury of any number of men. These questions were long since settled in Emerick v. Harris, 1 Binn. 416, and other cases in Pennsylvania. The judgment must be reversed.
Bartlet, J., dissented.